These two cases arise out of an automobile collision which occurred on Monday, November 10, 1947, at about 5:30 P.M., in Livingston Parish, on Highway No. 190, just a short distance west of the settlement of Satsuma. These cases being based on the same accident and involving the same facts were consolidated for trial, with the understanding that separate decrees would be rendered in each case.
It is shown that on the date, time and place above recited one Elliott M. Hartman was driving west on Public Highway No. 190 in his 1933 pick-up Chevrolet truck, and that Verlon Maginnis, an employee of Dr. Joseph H. Slaughter, while in the course and scope of his employment, was also travelling west on the same highway in the rear of the Hartman truck. Travelling east on the same highway was a Chevrolet automobile owned and operated by Buffington S. Mayer, Jr. It is shown that immediately west of Satsuma the highway is straight for a distance of approximately two miles, with a slight southwest curve at the western end of this two-mile stretch. At approximately the middle of this two-mile stretch the Slaughter truck being operated by McGinnis struck the rear of the Hartman truck, pushing it into the south or left lane of said highway, and immediately thereafter, the Chevrolet automobile driven by Mayer, crashed broadside into the right of the Hartman truck. As a result of said crash it completely demolished the truck and knocked it around so that it came to rest on the south side of said highway, facing in a north by northwesterly direction. As a result of this double collision Mr. Hartman suffered injuries from which he died on November 14, 1947, and Buffington S. Mayer, Jr., suffered personal injuries and damages to his automobile.
The widow of Elliott M. Hartman, Mrs. Estelle D. Hartman, filed suit against Buffington S. Mayer, Jr., and Dr. Joseph H. Slaughter, based on the allegations that the accident was caused solely by gross negligence, including specific acts of negligence set forth in the petition, of McGinnis operating the Slaughter truck in the course and scope of his employment, and of Buffington S. Mayer, Jr., operating his own Chevrolet automobile; that as a result of the accident, she, as the surviving widow of Elliott M. Hartman, suffered total damages in the amount of $43,142.85, which amount is itemized in her petition. She prays for judgment, in solido against the said defendants, Buffington S. Mayer, Jr., and Dr. Joseph H. Slaughter.
Buffington S. Mayer, Jr., in turn, filed suit against Dr. Joseph H. Slaughter and Verlon McGinnis, alleging that the accident was caused solely by the gross negligence of Verlon McGinnis, including specific acts of negligence set forth in the petition, and that Verlon McGinnis was operating the Slaughter cattle truck in the course and scope of his employment by Dr. Slaughter. He further alleges in his petition that the Slaughter cattle truck was covered by a policy of public liability insurance, issued by an insurance company unknown to petitioner, but well known to Dr. Slaughter, and reserves the right to make the insurer an additional defendant in his suit. This plaintiff alleges that he sustained, as a result of the accident, damages itemized in his petition, in the sum of $10,381.81.
The defense is to the effect that the collision of the Slaughter truck with the Hartman truck was unavoidable for the reason that the Slaughter truck was being driven at a reasonable rate of speed with proper lights and in a proper mechanical condition and that the Hartman truck could not be seen in time to avoid the accident for the reason that it was proceeding very slowly and without any taillight and for the further reason that McGinnis, the driver of the Slaughter truck, was blinded by the bright lights of the on-coming Mayer automobile. The defendants contend that the collision between the Slaughter truck and the Hartman truck caused only minor damage to the two trucks and that the real cause of the second crash between the Mayer automobile *Page 168 
and the Hartman truck which resulted in the death of Hartman and personal injuries and automobile damage to Mayer was the gross negligence of Mayer in travelling on a wet highway at an excessive speed with his bright lights burning and in failing to stop or slow down when he saw or should have seen the crash between the two trucks. The defendants deny that McGinnis was guilty of any negligence which was the proximate cause of the accident and in the alternative, in the event that the Court should find that McGinnis was negligent, they plead contributory negligence on the part of Mayer and on the part of the deceased Hartman in bar of recovery.
After trial of the case the trial judge, for written reasons assigned, came to the conclusion that the accident was caused solely by the negligence of Verlon McGinnis while in the course and scope of his employment by the defendant Slaughter, and accordingly he rendered judgments as follows:
In favor of Mrs. Estelle D. Hartman against Dr. Joseph H. Slaughter in the total sum of $15,142.85, itemized as follows:
Medical Expenses .................. $ 252.50 Funeral Expenses .................. 390.35 For mental pain and suffering of the deceased ................. 1,000.00 For the loss of her husband's love and affection and companionship and the loss of her husband's earnings and support ......................... 13,500.00 --------- Total ................... $15,142.85
In favor of Buffington S. Mayer, Jr., against Dr. Joseph H. Slaughter and Verlon McGinnis, in the total sum of ............ $ 2,181.81 being $278.35 for medical expenses, $888.46 for damage to the automobile; $15.00 for towage, $850.00 for pain and suffering and mental anguish, and $250.00 for permanent disfiguration, plus legal interest and costs.
The defendants have appealed both cases.
No answer to the appeal was filed in the Hartman case, but a brief was submitted setting forth the judgment below should be affirmed as against the defendant Joseph H. Slaughter and pointing out that the insurer of Slaughter, through counsel, introduced a true and conformed copy of public liability policy covering the said defendant's truck and admitting that should its assured be cast in judgment, it had a liability up to $10,000.00 as to one claim or overall liability up to $20,000.00 for all claims arising out of one accident. Since the plaintiff, Mrs. Estelle D. Hartman, has not appealed the judgment in her case, insofar as the other defendant, Buffington S. Mayer, Jr., is concerned, he is in the same position in so far as the appeal is concerned, as if he had never been sued.
The plaintiff Buffington S. Mayer, Jr., answered the appeal in his case setting forth that the judgment should be increased from $2,181.81 to $4,181.81, and praying for said increase in the amount of the award. As set forth in his brief, this plaintiff feels that the award for his pain, suffering and injuries, disability and permanent disfigurement, should be increased from $1,000.00 to $3,000.00, which, added to his actual damages for medical expenses and automobile damage, would make his award $4,181.81.
The main question involved in these two suits is whether or not the trial judge committed any manifest error in his finding of fact that the accident was caused solely by the negligence of McGinnis, the truck driver of Dr. Slaughter. In order to determine this question it appears appropriate to summarize the evidence of this voluminous record, as follows:
John Lewis, an employee of Dr. Slaughter, testified that he accompanied Verlon McGinnis in the Slaughter truck on the trip when the accident involved took place; that they left Plaquemine that morning and had arrived at Bogalusa at about 11:00 or 11:30, and that on their return trip they left Bogalusa at about 1:30 or 2:00 o'clock in the afternoon and arrived at Hammond at exactly a quarter of 5:00; that "we went that 15 minutes to get a sandwich, around 5:00 o'clock we got this *Page 169 
sandwich, ate it, and went on." He adds that when they reached the place where they got the sandwiches it started to rain hard, and as they kept driving towards Baton Rouge, it kept on raining. He states that he could not see through the windshield on his side, and it is admitted that there was no windshield wiper on his side. He states that they were travelling at about 35 miles per hour and that he did not see anything when the accident happened; that he just heard the lick, and then after that he heard another; that he thereupon exclaimed "Oh, Mr. Buddy (McGinnis) what are we going to do?" that they sat there together for a minute and Mr. McGinnis then suggested that they go see what happened and that he saw a young man (Mayer) coming out of the other car and asking for help, and that Mr. Buddy walked up to the young man, and he put his hand on Mr. Buddy's shoulder and Mr. Buddy flagged a truck and asked the occupants to carry the young man to the doctor; that they found Mr. Hartman in the pick-up truck and that he and two other men took him out of the truck and put him in a car belonging to the two men, and that these men carried him to the doctor. He states that after the collision the Mayer Chevrolet was on the south lane of traffic headed east, and the Hartman truck was off the pavement on the south side, headed northwest; that the truck in which he was riding passed the truck that they hit about 15 or 20 feet; that after the collision, the Chevrolet car was still on the highway about 10 or 15 feet behind their truck. Being asked the question whether he heard any brakes or anything on the highway, he answered that the only thing he heard were the two licks.
He estimates that the second impact occurred about three to five seconds after the first impact. He was tested on this point by the Court and counsel who made him strike a pencil on the desk indicating the first and second impact, and on this test repeated several times, the time varied from three to five seconds.
Mr. McGinnis testified that he was 27 years of age, and had been employed by Dr. Slaughter for some 7 years as truck driver, tractor driver and hauling cattle; that he had been driving the particular Chevrolet semi-trailer truck involved in this accident since 1945; that the occasion of the trip on the day of the accident was to bring a load of hay from Plaquemine to Bogalusa, a distance of about 125 miles, and that they arrived at Bogalusa at about noon. On the return trip he too states that they arrived at Hammond at a quarter to five, as shown by the bank clock; that his truck was equipped with a windshield wiper only on the driver's side, and that it was working properly, and that the truck itself was in first-class condition; that at the time they left Hammond it was raining and that they travelled at about 30 to 35 miles per hour and had not passed much traffic; that the accident happened on a straight stretch after they passed the settlement of Satsuma headed west, at about six o'clock P. M., after dark and while it was raining steadily; that he did not see the Hartman truck until he was within a few feet thereof because the truck had no taillight and because the lights of an on-coming car (the Mayer car) blinded him. He states that the Hartman truck was only about 12 feet in front of him when he saw it and that it was hardly moving, and when he did see it he hit his brakes and pulled to the right, and that the left front of his truck hit the right rear of the Hartman truck, and that the Hartman truck then swerved to the left side and that his truck rolled by and he then put it in low gear and pulled it off of the road. He says that the car that blinded him had not passed him at the time that he struck the Hartman truck. He testifies that the on-coming automobile failed to dim his light, but upon further questioning on that point he states: "I don't believe he did". He admits that he was having difficulty with his windshield fogging up that night. He further testifies that just a few seconds or so after the collision between his truck and the Hartman truck, he heard the second impact; that at the time of the second impact he had passed the Hartman truck. He admits that after the impact of his truck with the Hartman truck, he continued about 30 feet farther.
He states the on-coming Chevrolet was travelling pretty fast, but that he did not see the actual collision of the Chevrolet *Page 170 
with the Hartman truck, but heard the impact and that after he stopped his truck, having driven it on the shoulder, he went over to the Chevrolet car and there saw young Mayer, and seeing that he was hurt and asked to be taken to a doctor, he placed him in a pick-up truck that came by right after the accident and had him taken to a doctor. He then went to the Hartman truck and found Mr. Hartman in an unconscious state and thought that he was dead; that Hartman recovered consciousness, and complained of pain and groaned and asked for someone to get his wife. He was asked whether he remembered when Police Sergeant Martin and Trooper Riles came to get a report on the case, and he said "Yes", that they were there that night; but he denies that they are correct in saying that his truck was 300 feet from the point of the collision. Upon being asked the question by the Court "You testified that you were blinded by the lights of an oncoming car?" He answered "Yes". The Court: "Can you estimate how far away the car was when it blinded you?" Answer: "Just as it came around the curve." He then adds that he does not know how far the curve was from the scene of the accident, and states that he hit the Hartman truck "a few seconds or a few minutes" after he was blinded, and that on being asked how far he traveled after being blinded, he states "Not too far". On further cross-examination, he admits that the Mayer automobile would have to be a mile or more away when he rounded the curve and came in view, and during all of this time he was blinded by the lights of Mayer's automobile. Thereupon, in answer to the question "And yet you did not stop your car until after the collision?" He answered: "Right after I was blinded the pick-up truck was in front of me". Upon being asked "and it is also true, is it not, that when you were first blinded by the lights that you could have stopped your truck and pulled off the side of the road?" he answered, "When the lights first came upon my face I could not see, but I thought I was able to keep my distance." He admits that he asked for "dimmers" and kept on driving all the time regardless.
Trooper Riles testified that he investigated the accident some 25 minutes after its occurrence, together with Sergeant Martin; that the only person he interviewed was Mr. McGinnis; that he found that the Slaughter truck was completely off the highway with the front some 300 feet from the scene of the accident, with its parking lights turned on. He states that his report shows that Mr. McGinnis made a statement to him to the effect that he was blinded momentarily by the lights of the Mayer automobile and that he did not see the Hartman truck, which was travelling west (same direction as his own truck). He adds that McGinnis also stated that as a result of being blinded he struck the Hartman truck causing it to swerve in the path of the Mayer car. This statement by McGinnis was made some 25 minutes after the accident. He corroborates the testimony about the scene of the accident being on a straight stretch of road and that it was raining that night. He also states that he was notified of the accident at 5:50 o'clock and traveled some 14 miles, arriving there at 6:11, so that apparently he is merely guessing about being at the scene of the accident 25 minutes after its occurrence, unless the accident occurred at 5:46. With reference to the damage to the automobiles involved in the collision, he states that the Chevrolet automobile was damaged in front and that the Hartman truck was damaged on the right side, and the best he can remember it was in three pieces, all demolished; that the Slaughter cattle truck was damaged at the left front fender, and left front bumper and the left front side of the radiator, an estimated damage of about $250.00; that the bumper on the Slaughter truck was made out of pipe like those on large oil trucks. Upon being questioned about the situs of the accident, he states that the highway where it occurred has 18 feet of pavement, with shoulders on each side of approximately 6 feet.
Mr. Ted Loftess testified that he arrived at the scene after the accident had occurred, along with Mr. Henry Kinchen; that when he arrived there were a few cars there, and then a couple of minutes later there was a bunch of cars there; that he *Page 171 
assisted in removing Mr. Hartman from his truck, and placing him in his car and took him to the Wigginton Infirmary at Hammond; that when Mr. Hartman was placed in his car he was groaning and apparently conscious and suffering great pain; that towards the last of the trip, he was semi-conscious. He states when he arrived at the scene the Chevrolet car was facing the Hartman truck and was entirely on the concrete on its right-hand side and that the Hartman truck was ahead, facing north. He admits that he saw several people at the scene of the accident, but does not recall who they were.
Mr. Henry Kinchen corroborates the testimony of Mr. Loftess.
Mr. A. B. McMorris testified in effect that he saw Mr. Hartman shortly before the accident at his, McMorris' home; that Mr. Hartman was driving a pick-up truck and that he saw Hartman driving away from his home in front of him, and thereafter saw a vehicle in front of him which definitely had a taillight. He refused to positively state that the vehicle ahead of him was the Hartman truck, but states that no other car passed him from the time Hartman left his place; in other words, his testimony is to the effect that he did see a taillight on the Hartman truck. He further testifies that Hartman was engaged in hauling cattle and in small farm operations, and that the truck in question, as far as he knows, was always well taken care of.
Buffington S. Mayer, Jr., testified that he is 28 years of age and has been engaged in the general insurance business since March, 1946, and is the owner of the Fleet-line 1947 Chevrolet involved in this accident; that at the time of the accident it was raining, that the accident happened at about 5:30; that he left his office in Baton Rouge shortly before 5 P.M., to beat the 5 P.M. traffic and was going to Hammond, Louisiana, that he walked to his car which was parked approximately three blocks from his office and then proceeded to his trip; that he travelled approximately twenty-six miles to the scene of the accident, which he states occurred shortly after 5:30 P.M. Later he testified that by actual check on his speedometer the distance from Wickwire's Bar, near the scene of the accident, to the parking place of his car in Baton Rouge showed a mileage of twenty-five and one-half miles. He testified further that his speed was approximately forty-five miles per hour; that the road was wet and it was then actually raining; that he was travelling with his lights burning and that he would alternate from bright to dim upon meeting traffic; that upon making the curve at the west end of the straight stretch of road he saw three lights approaching him. The lights referred to were apparently from the Hartman truck and the Slaughter truck travelling in its rear. He testifies further that he did not see the crash between the Slaughter truck and Hartman truck but merely saw a flash of light in his path and thereupon released his accelerator and immediately thereafter crashed into an object which he afterwards was informed was the Hartman truck.
In connection with his testimony, it was brought out that on Nov. 14, 1947, he signed a written statement taken from him by Attorney Miller, in the presence of his, Mayer's, mother (statement in record) and State Policeman Regusa, in which he stated that he had seen the truck collision approximately one block away, or 300 feet, and that said statement, before being signed, was read to him by his own attorney. He does not deny making such a statement, but it is contended that the statement was taken only 4 days after the accident, while he was still in the hospital and under the effect of drugs, and it is testified that at the time he was very loquacious and was even advised by Lt. Regusa not to sign such statement; that as shown by the original statement he at first said "one block," which was later scratched out and changed to "300 feet", and also some other remarks in the statement were scratched out. The trial court apparently was not very much impressed by the statement, and neither are we, because of the circumstances under which it was taken. Moreover, there is no showing whatsoever that Mr. Mayer was under the influence of alcohol, or in any abnormal *Page 172 
condition at the time of the accident, and the evidence is to the effect that the second collision occurred immediately after the first and too soon for him to have travelled 300 feet.
Dr. Charles McVea testified with reference to the injuries of Mr. Mayer, whom he treated at The Lady of the Lake Sanitarium in Baton Rouge for some six days, and thereafter in his office. He states that Mayer had an extensive laceration of his head, approximately five inches long, and a complete fracture of the middle third of the radius of the forearm and bruises and lacerations about the head and area of both knees; that he applied a cast to his arm and gave him sedatives and medication to combat infection; that he was in considerable pain the night he came in, and required sedatives for several days; that the sedatives quieted him and dulled his sensory responses; that among the sedatives given him was morphine, and that the effect of the drugs lasted about four hours. He also stated that Mayer suffered some degree of concussion and that the treatment therefor was merely rest in bed. He also states that he has remained with a "V" shaped scar on his forehead, extending back under the hair line, and five inches in length, and that said scar will remain permanently, but will become less noticeable as time goes on. The Doctor, in effect, testified that in his opinion, the use of drugs in this case was not in an amount sufficient to cause the patient to give any untrue statements, and that he did not see him at any time when he was under the effect of the drugs to the degree that he did not know him, and could not talk to him. Dr. McVea's testimony is to the effect that the drugs caused the patient not to be "as alert as usual and more irritable than usual for a period of several days after the accident."
Plaintiff, Mrs. Estelle D. Hartman, testified that her husband had been engaged in farming, the cattle business, and some barber work, and that he earned approximately $2,000.00 to $2,500.00 per year. She testified further that as a result of his injuries he suffered great pain during the four days prior to his death. She was with him at the hospital during that time. She states further that at the time of his death he was 60 years of age. (The death certificate gives his age as 61.) If 60, his life expectancy was 14.10 years, and if 61, 13.47 years. She testified further that prior to her husband's death she was postmistress at Corbin and has continued her position at a salary of $1,206.00 per year, plus fees for money orders. No corroborating testimony of her husband's earnings was introduced. She states that he made an income tax return for the year before, but a copy of such return was not produced.
Lt. Regusa testified that he is employed by the State Police and that he went to the Lady of the Lake Hospital with Mr. Miller, Attorney for defendant Slaughter, to obtain a statement from Mr. Mayer with reference to the accident; that Mr. Mayer at the time was in bed, but was in good shape; that the statement was taken by Mr. Miller, before him, Lt. Regusa and Mayer's mother, and that no threat or intimidation of any kind was made; that Mr. Mayer talked freely; that the statement was prepared by Mr. Miller, that some corrections were made at Mr. Mayer's request and that he suggested to Mayer that he should not sign a statement like that because in a statement before he said he was unconscious, but then he continued to state freely what happened at the accident. He says: "I told him I thought he should not say that, and we got Mr. Miller to scratch out what is scratched out." This witness admitted to Mr. Miller that a conversation with reference to Mr. Mayer's scar and broken arm was had prior to taking the statement; that Mr. Miller tried to encourage Mr. Mayer by stating to him that he too had sustained a bad scar and a broken arm, and had completely recovered therefrom. In other words, Regusa admits that the statement was taken only after casual conversation and not immediately upon entering the patient's room. He also testifies that the statement was read by Mr. Mayer's attorney and was signed by Mr. Mayer while his attorney was there. He also adds that no leading questions were asked Mr. Mayer, and that Mr. Mayer dictated his *Page 173 
statement from his sick bed; that Mr. Mayer was in a talkative mood and wanted to give a statement and seemed in very good spirits and, in fact, practically insisted that he give a statement.
The remainder of the evidence consists of photographs showing the damaged Hartman truck and Mayer Chevrolet, and from these it is very apparent that the Chevrolet crashed with great force into the right side of the Hartman truck. There is, of course, also contained in the record the statement of Mr. Mayer, which has been discussed in the testimony summarized above.
Documentary proof was introduced of the actual medical expenses of Mr. Hartman and of Mr. Mayer, and of the damage to Mayer's car. These items are not in dispute.
As to the Hartman-Slaughter suit, as previously stated, the only issues involved are the questions of whether or not the driver of the Slaughter truck was negligent, and if so, whether the deceased, Hartman, was guilty of contributory negligence, and in the event of liability, the quantum of damages.
The negligence of the Slaughter truck driver is practically conceded. Due to the prevailing weather condition, he was driving too fast. It had been and was raining; the inside of his windshield would become foggy, yet he continued, so he says, to drive at about thirty-five miles per hour regardless of the fact that he says that he became blinded when the Mayer automobile came around at the western end of the two-mile straight stretch of road. He was not keeping a proper lookout and did not have his truck under proper control. We fail to find any negligence on the part of the deceased Hartman. He was admittedly travelling at a slow speed, which is in his favor considering the weather conditions and the on-coming Mayer car. The preponderance of the evidence is that his car was equipped with a taillight, which was burning.
As to the Mayer-Slaughter suit, the same questions are presented as in the Hartman-Slaughter suit.
Since we have found that the Slaughter truck driver was guilty of negligence, we see no reason to discuss the matter over again.
The most serious question in this case is the contributory negligence of Mayer.
Our appreciation of the facts in this case leads us to the conclusion that the Hartman truck was not in the lane of travel of Mayer and within the range of Mayer's lights a sufficient length of time for Mayer to observe Hartman's truck and stop his automobile before striking the truck. It therefore cannot be said that Mayer did not keep a proper lookout and did not have his car under proper control. It may be conceded that Mayer was operating his car at an excessive rate of speed due to the weather condition then prevailing, yet the fact remains that his speed was not a proximate cause of the accident, and we agree with the trial judge that the sole proximate cause of the accident was the negligence of McGinnis.
As to the quantum in the Hartman-Slaughter suit, we are of the opinion that the amount awarded to the widow by the District Court for the loss of her husband's love and affection, and companionship, loss of her husband's earnings and support and for the mental pains and suffering of her deceased husband is excessive and is not in line with our recent awards. We believe that an award of $10,000.00 does substantial justice. We will therefore reduce the amount awarded to Mrs. Hartman by the sum of $4,500.00, and as thus reduced the judgment will be affirmed.
As to the quantum in the Mayer-Slaughter suit, we are of the opinion that the award made by the District court is certainly not excessive and is in line with our jurisprudence and therefore the judgment will be affirmed. *Page 174